UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DELAWARE COUNTY EMPLOYEES RETIREMENT FUND and EDMUND SWEENEY, derivatively on behalf of COMMONWEALTH REIT, <br><br> Plaintiffs, <br><br> v. <br><br> BARRY M. PORTNOY, ADAM D. PORTNOY, JOHN C. POPEO, WILLIAM A. LAMKIN, JOSEPH L. MOREA, FREDERICK N. ZEYTOONJIAN, PATRICK F. DONELAN and REIT MANAGEMENT & RESEARCH LLC, <br><br> Defendants, and <br><br> COMMONWEALTH REIT, <br><br> Nominal Defendant. | NO._____ <br><br><br><br> JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiffs Delaware County Employees Retirement Fund and Edmund Sweeney (collectively, "Plaintiffs"), by and through their undersigned attorneys, submit this derivative Complaint (the "Complaint") seeking relief for the benefit of CommonWealth REIT ("CWH" or the "Company") against: its former and current trustees Barry M. Portnoy ("B. Portnoy"), Adam D. Portnoy (A. Portnoy"), William A. Lamkin ("Lamkin"), Frederick N. Zeytoonjian ("Zeytoonjian"), Joseph L. Morea ("Morea") and Patrick F. Donelan ("Donelan") (collectively, the "Trustees"); its officer John R. Popeo ("Popeo"); and its eternal advisor REIT Management & Research LLC ("RMR").  Collectively the Trustees, Popeo and RMR are referred to as

"Defendants". Plaintiffs are, and have been at all relevant times complained of herein, shareholders of CWH.

The allegations below are based upon personal knowledge as to Plaintiffs and their own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") public filings made by the Company, other regulatory filings and reports, industry analysts' reports about the Company, press releases and other public statements issued by the Company and Defendants, news articles, court documents, and legislative documents including hearing testimony and exhibits.

## SUMMARY OF THE ACTION

1. This derivative action is brought on behalf of CWH against certain of its current and former trustees, officers and external manager to:

(a) permanently enjoin Defendants from being indemnified by the Company for any losses, judgments, liabilities, expenses or amounts paid in connection with the action before the American Arbitration Association captioned *CommonWealth REIT, et al., v. Corvex Management L.P., et al.*, AAA No. 11-512-Y-276-13 (the "Arbitration" or the "Corvex-Related Arbitration"), and to recover for the Company any such amounts already paid on behalf of Defendants in the Arbitration;

(b) permanently enjoin advances from the Company to the Defendants for legal expenses and other costs incurred as a result of current and future shareholder actions initiated against Defendants, and to recover for the Company any such advances made on behalf of Defendants; and

(c)   declare that Defendants' failure to secure directors' and officers' liability insurance, which was part of their scheme to insulate themselves from shareholder lawsuits, constitutes  a breach of their fiduciary duties to the Company, and hold Defendants liable for monetary damages caused to the Company as a result of such breach.

2.   CWH has advanced and continues to advance tens of millions of dollars in legal fees and costs in defense of Defendants' misconduct asserted in the Corvex-Related Arbitration and various shareholder actions.  *See, infra,* ¶¶ 39-50 and 64-73.

3.   Section 7.4(b) of CWH's Declaration of Trust ("Decl. of Trust") provides that there will be no indemnification by CWH to any "Affiliated Trustee or Affiliate" who fails to act in the "best interest" of the Company or who engages in acts that constitute "negligence or misconduct."   See The Amendment and Restatement of Declaration of Trust, dated June 30, 2010, attached as Exhibit A.  Each of the Trustees is an Affiliated Trustee or an Affiliate thereof and is, therefore, subject to the limitations on indemnification set forth in § 7.4(b).

4.   Specifically, pursuant to § 7.4(b), Defendants are not entitled to indemnification from CWH in connection with the Corvex-Related Arbitration.  The Arbitration arose out of a series of egregious acts by Defendants to stop Corvex-Related, two CWH shareholders (and any CWH shareholder for that matter), from exercising their right to pursue a consent solicitation of their fellow CWH shareholders.  On the basis of a robust evidentiary record developed in the Arbitration, including two weeks of witness testimony, the three-member arbitration panel (the "Panel") concluded that there **is no question that Trustees erected a complex wall of procedural hurdles to any consent solicit** and that shareholders were "**frustrated** by the Bylaw barriers," "CWH's current Bylaws require **material modification**", the provisions at issue are

"**invalid**", at least one bylaw amendment "**goes far beyond what would be considered a reasonable or appropriate**," and the invalid bylaws were "**inconsistent with the Declaration of Trust**." *See* Interim Order Granting in Part and Denying in Part Respondents' Motion for Partial Summary Judgment, dated August 7, 2013 [hereinafter, the "August Award"], attached hereto as Exhibit B and Interim Arbitration Award, dated November 18, 2013 [hereinafter, the "Nov. Award"], attached hereto as Exhibit C.

5.      In sum, Defendants adopted a series of invalid and unreasonable bylaw amendments to bar CWH shareholders from engaging in a consent solicitation, a right that was granted to shareholders by the Decl. of Trust in 1986.  Under § 7.4(b) of the Decl. of Trust, indemnification is not permitted if the Defendants' actions (here, in adopting the invalid and inconsistent bylaws) are only negligent (*i.e.,* unreasonable) or constitute misconduct (*i.e.,* unacceptable or improper behavior). The Trustees' conduct exceeds the negligent and misconduct standard, and amounts to willful malfeasance, which would also render indemnification improper under Section 7.4(a) of the Decl. of Trust.

6.      Consequently, Defendants are not entitled to be indemnified by the Company under the Decl. of Trust § 7.4(b) any losses, judgments, liabilities, expenses or amounts paid in connection with the Corvex-Related Arbitration and any such amounts belong to, and must be returned to the Company.

7.      In addition, the Decl. of Trust prohibits the *advancement* of legal fees and other costs associated with any shareholder action brought against Affiliated Trustees and their Affiliates.  Since all Defendants are Affiliated Trustees or Affiliates, they are not entitled to any advances on their legal fees and costs in connection with any shareholder action brought against them and the Corvex-Related Arbitration, and must repay all such impermissible advances.

Plaintiffs also seek an order enjoining the Board from making any prospective advances of legal fees and other costs to Defendants in association with any shareholder action and the Arbitration.

8.      Finally, Defendants breached their fiduciary duties owed to CWH by failing to secure directors' and officers' liability insurance while knowingly and intentionally engaging in conduct that exposed CWH to substantial liability and costly litigation.  Such failure was a complete departure from prudent business practices, was done in furtherance of their own self-interests, and constituted a waste of CWH's corporate assets.  As a result, CWH has been damaged by Defendants' breaches of fiduciary duty, and are liable to CWH for the monetary damages (including fees, expenses or liability) to CWH on account of such misconduct.

## THE PARTIES

### A.  Plaintiffs

9.      Plaintiff Delaware County Employees Retirement Fund ("DelCo") was founded to provide retirement benefit services to active and retired employees of Delaware County, Pennsylvania.  DelCo has been a shareholder of CWH since 1999 and at the time of the conduct at issue herein.  DelCo is a citizen of Pennsylvania.

10.     Plaintiff Edmund Sweeney ("Sweeney") has been a shareholder of CWH since at least 1999 and at the time of the conduct at issue herein.  Sweeney is a citizen of Florida.

11.     All named plaintiffs are collectively referred to herein as "Plaintiffs".

### B.  Nominal Defendant

12.     Nominal Defendant CommonWealth REIT ("CWH" or the "Company") is a Maryland real estate investment trust ("REIT") with its principal executive offices located in Newton, Massachusetts.  CWH primarily owns office and industrial buildings located throughout the United States in suburban areas and central business districts of major

metropolitan markets.  CWH has no employees.  It is and was at all relevant times managed by RMR.  All of CWH's executive officers are also executive officers of RMR.  As of August 5, 2013 there were 118.3 million shares outstanding of the Company's common stock.

### C. Defendants

13.     Defendant Reit Management & Research LLC ("RMR") is incorporated in Delaware and headquartered in Newton, Massachusetts.  Defendants B. Portnoy and A. Portnoy own RMR.  RMR manages CWH and four other publicly-traded REITs formed with assets transferred from CWH, namely (i) Hospitality Properties Trust (NYSE: HPT) ("HPT"); (ii) Senior Housing Properties Trust (NYSE: SNH) ("SNH"); (iii) Government Properties Income Trust (NYSE: GOV) ("GOV"); and (iv) Select Income REIT (NYSE: SIR) ("SIR").

14.     Defendant Barry M. Portnoy ("B. Portnoy") co-founded CWH and served as its Managing Trustee since its formation in 1986.  That same year, B. Portnoy founded RMR and has served as its Chairman since 1986.  He and his son A. Portnoy collectively own 100% of RMR.  B. Portnoy and RMR are alter egos of one another.  B. Portnoy is also the founder and trustee of all of the public real estate companies managed by RMR.  He has served as the managing trustee of SIR, since 2012; GOV since 2009; SNH since 1999; and HPT since 1995.  According to SEC filings, B. Portnoy owns: 238,406.073 shares of CWH common stock; 4,000 shares of SIR common stock; 43,911.802 shares of GOV common stock; 242,041.628 shares of SNH common stock; and 354335.526,576 shares of HPT common stock.  B. Portnoy also founded an insurance company ,Affiliates Insurance Company ("AIC"), and has been a director of AIC since 2008.  B. Portnoy has required and caused CWH, SIR, GOV, SNH and HPT to invest in AIC, with the Trustees' acquiescence.  B. Portnoy is a citizen of Massachusetts.

15.     Defendant Adam D. Portnoy ("A. Portnoy") is the son of B. Portnoy.  He has served as the Company's Managing Trustee since 2006 and President since January 2011.  A. Portnoy also served as CWH's Executive Vice President from 2003 to 2006.  Concurrently, A. Portnoy has served as RMR's President, Chief Executive Officer and Director since 2006, and Vice President of RMR from 2003 to 2006. A. Portnoy and B. Portnoy own 100% of RMR, which, from 2009 through the Third Quarter of 2012 received over half a billion dollars in management fees from CWH, as well as SIR, GOV, SNH and HPT.  Moreover, A. Portnoy has served as a Managing Trustee of AIC since 2008, HPT since 2007, and SNH since 2007.  He has been the Managing Trustee of GOV since 2009 and served as its President from 2009 to 2011. According to SEC filings, as of January 1, 2014, A. Portnoy owned 48,100 shares of CWH; 4,000 shares of SIR; 44,467 shares of GOV; 127,873 shares of SNH; and 86,858 shares of HPT.  A. Portnoy is being sued in his capacity as both an officer and trustee of the Company. A. Portnoy is a citizen of Massachusetts.

16.     Defendant Frederick N. Zeytoonjian ("Zeytoonjian") has been a CWH trustee since 1999 and serves on the boards of other companies run by RMR and the Portnoys.  He is Chairman of CWH's Audit, Nominating, and Governance Committees.  Zeytoonjian is also, along with B. Portnoy and A. Portnoy, a Trustee on the Board of SNH, a former subsidiary of CWH that is managed by RMR.  Zeytoonjian is a citizen of Connecticut.

17.     Defendant William A. Lamkin ("Lamkin") has been a CWH trustee since 2006. Lamkin also serves on the boards of other companies run by RMR and the Portnoys.  He is a member of CWH's Audit Committee, as well as its Nominating and Governance Committee. Lamkin is a citizen of California.

18.     Defendant Joseph L. Morea ("Morea") joined the Board of CWH on July 18, 2012 and serves on the board of at least one other company run by RMR and the Portnoys. He is a member of CWH's Audit, Compensation, and Nominating and Governance Committees. When Morea joined the Board, he was the Vice-Chairman, Managing Director and Head of U.S. Equity Markets for RBC Capital Markets, one of the co-managers of a 2013 $500 million equity offering conducted by CWH, discussed *infra* at ¶¶ 32(a), 60, 91 and 96. Shortly after Morea became a CWH Trustee, Defendants gave Morea and RBC Capital Markets multi-million dollar commercial and investment banking deals that earned him and RBC Capital millions of dollars in commissions and fees. Morea retired from RBC at the age of 57, just five months after he joined the Board. Morea is a citizen of Massachusetts.

19.     Defendant Patrick F. Donelan ("Donelan") served as a trustee of CWH from 1998 through July 18, 2012. He has also served on the board of TravelCenters of America LLC ("TravelCenters"), an RMR-controlled company, since 2007. On July 18, 2012, Donelan unexpectedly retired from CWH's Board before his scheduled term was up and just three weeks before the Company announced a likely dividend cut. Donelan, as well as the other trustees and officers of RMR, have made regular financial contributions to the Immigrant Learning Center ("ILC"), a Massachusetts-based charity founded by B. Portnoy's spouse, Diane Portnoy, at the behest of B. Portnoy. Donelan was designated by ILC as a "Lifetime Board Member." Donelan is a citizen of Massachusetts.

20.     Defendant John C. Popeo ("Popeo") has served as the Treasurer and Chief Financial Officer ("CFO") of CWH since 1999 and Assistant Secretary of CWH since October 2008, and served as Secretary of CWH from 1999 to October 2008. Popeo has also been Treasurer and an Executive Vice President of RMR since 1997 and September 2008,

respectively, and previously served as a Vice President of RMR from 1999 to 2006 and as a Senior Vice President from 2006 to September 2008.  Popeo has also served as the Treasurer and CFO of SIR since its formation in 2012. Popeo served as Vice President of RMR Advisors (a Portnoy affiliated entity) from 2004 to November 2009 and has served as Vice President of RMR Real Estate Income Fund and its predecessor funds (also Portnoy affiliated entities) from shortly after their formation (the earliest of which was in 2002). According to SEC filings, Popeo owns 33,500 shares of CWH and 3,000 shares of SIR. Popeo is a certified public accountant and a citizen of Massachusetts. Treasurer and Chief Financial Officer

21.     Defendant Reit Management & Research LLC ("RMR") is incorporated in Delaware and headquartered in Newton, Massachusetts. RMR is owned by the Portnoys. Among other things, RMR manages CWH and four other publicly-traded REITs formed with assets transferred from CWH, namely: HPT, SNH, GOV, and SIR.  RMR is a citizen of Massachusetts.

22.     B. Portnoy, A. Portnoy, Lamkin, Zeytoonjian and Morea are collectively referred to herein as the "Trustees," and together with Popeo and RMR, the "Defendants".

23.     Non-parties Ann Logan and Ronald Artinian were appointed to the Board on January 6, 2014 after the Trustees publicly acknowledged that CWH's Board of Trustees needed to increase the size of the Board to include at least two new "Independent Trustees."  To that end, the Board's Nominating and Governance Committee appointed Logan and Artinian, each of whom purportedly had no prior dealings with the Portnoys.  Nonetheless, the majority of the Board is still controlled by and beholden to the Portnoys.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over the subject matter of this case pursuant to Title 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy in this matter exceeds $ 75,000.

25.     Venue is proper pursuant to 28 U.S.C. § 1401, as the Company may properly sue Defendants in this District, the Company's principal place of business.

26.     This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

## FACTUAL BACKGROUND

### A.     The Events Leading Up To The Corvex-Related Arbitration

27.     Following years of self-dealing, which contributed to declining revenues and poor performance by CWH, on or around February 26, 2013, two CWH shareholders Corvex Management, LP and Related Fund Management, LLC ("Corvex-Related"), and certain of their affiliates, disclosed that they had accumulated nearly 10% of CWH's common stock and declared their intent to make an offer to purchase all CWH common stock at a premium over market price.

28.     Given Defendants' abysmal performance and corporate governance track record, Corvex-Related also stated their intention to initiate a consent solicitation seeking CWH shareholders' approval to remove the entire Board of Trustees, pursuant to the Decl. of Trust § 2.3, which provides that:

> [a] Trustee may be removed at any time with or without cause by a vote or consent of holders of Shares representing two-thirds of the total votes authorized to be cast by Shares then outstanding and entitled to vote thereon.

29.     On March 1, 2013, the Trustees amended the Company's Bylaws to make it impossible for Corvex-Related shareholders to initiate their consent solicitation.   This amendment imposed an ownership requirement on shareholders seeking a record date to initiate a consent solicitation that was so impossible and unreasonable, that only three shareholders could actually satisfy the requirements.   Thus, the practical effect of this bylaw amendment was the elimination of CWH shareholders' right to remove a trustee by shareholder consent.

30.     Corvex-Related initiated a civil action against the Trustees in the Maryland Circuit Court to invalidate the unlawful bylaw amendment adopted on March 1, 2013 as well as other amendments aimed at frustrating the consent solicitation process.   In response, Trustees caused CWH to initiate an arbitration seeking declaratory relief.

31.     On March 13, 2013, Corvex-Related initiated their consent solicitation seeking the removal of the entire Board under the Decl. of Trust § 2.3.

32.     In the midst of the consent solicitation, the Trustees engaged in a pattern of willful and grossly negligent misconduct that caused harm to CWH and its shareholders.   For example:

   a.     Trustees caused CWH to sell 40 million shares of CWH common stock at a discounted price, and to investors deemed "friendly" to the Portnoys ("equity offering").   CWH had suffered damages of *over $200 million* due to the sale of its stock at below market prices, and the interests of the existing shareholder base (including Corvex-Related) were diluted *by 40%*;

   b.     Trustees told investors that Corvex-Related's actions could trigger the change-in-control default provision in the Company's various debt covenants.   However, under the Company's credit agreement, dated August 9, 2010, the Board had the power to

avoid a default by simply approving the slate of board nominees.  Trustees' cheap threat of a major default was calculated to discourage shareholders from supporting any consent solicitation or slate of new nominees; and

      c.     Trustees threatened to sell certain of CWH's most valuable assets.  In response to such threats, on March 12, 2013, Corvex-Related sent a letter to Lamkin, Morea and Zeytoonjian, who were purportedly the "independent" trustees, urging them to form a special committee and cease any plans to enter into any extraordinary transactions that could further erode shareholder value, including any related-party transactions.  At the direction of RMR and the Portnoys, Lamkin, Morea and Zeytoonjian disregarded the request and permitted the sale of certain valuable CWH assets, including its equity interests in SIR and GOV, at a discount to market value.  CWH also lost its control premium in SIR without receiving any additional value or consideration.  Meanwhile, the Portnoys and RMR benefitted from these transactions because they put GOV and SIR further out of Corvex-Related's reach and secured their continued stream of fees from those entities.

33.    Defendants' actions in response to Corvex-Related's consent solicitation were grossly negligent and constitute willful misconduct, done solely to advance their own, not CWH's, interests. In March 2013, Defendants hired lobbyists to convince the Maryland Legislature to adopt an unpublicized (and unscrutinized) eleventh-hour legislative amendment to the Unsolicited Takeover Statute Amendment, H.B. 882, which was scheduled to go to final vote by April 8, 2013.  This new language would have permitted the board of a Maryland REIT to remove a trustee be for cause only, notwithstanding any provision in the REIT's Declaration of Trust (or charter) to the contrary.

34.     Defendants and their representatives misled the Legislature by characterizing the legislative amendment as a "technical" amendment, omitting any facts about the ongoing consent solicitation.  Indeed, Defendants submitted a legal opinion that directly contradicted Maryland law, which provides that "once a board is classified" under Maryland's Unsolicited Takeover Statute "its members may not be removed except for cause, unless the charter provides otherwise."  *See* James J. Hanks, Jr., *Maryland Corporation Law*, at § 14A.5 (2005 Supp.).  Defendants, who are fiduciaries of CWH and its shareholders, sought to amend Maryland law to eliminate shareholder rights set forth in the Company's own Decl. of Trust.

35.     Just days before the final legislative vote, news of the secretive amendment leaked and CWH shareholders voiced opposition to the amendment, including in an emergency hearing.  The Maryland Legislature rejected the additional language proposed by Defendants.  Accordingly, Defendants were stopped from trying to defeat the consent solicitation by way of a legislative amendment end-run, and, more broadly, from materially altering CWH shareholder rights and eviscerating the protection against wrongful entrenchment afforded to CWH through such rights.

36.     Having failed to achieve their goal through the legislative process, on April 15, 2013, the Trustees unilaterally amended the Bylaws of the Company to eliminate CWH shareholders' right to remove a trustee without cause.  Trustees had no authority to amend the Bylaws in a manner that was inconsistent with the Decl. of Trust.  Thus, in the midst of an ongoing consent solicitation and at the direction of the Portnoys and RMR, the Trustees sought to eliminate shareholder removal rights without authority, and in violation of § 2.3 of the Decl. of Trust and Maryland REIT Law.  Trustees' desperate attempt to secure a legislative fix followed by their violation of the Decl. of Trust and Maryland REIT Law amounts to bad faith

misconduct in that they knowingly tried to further their own self-interests to the detriment of CWH and shareholder rights.

37.     Their wrongful intent and blatant self-dealing is further evident in Defendants' utter disregard of the CWH Shareholders' vote on the re-election of Defendant Morea.  At the annual shareholder meeting on May 15, 2013, Defendant Morea failed to obtain the shareholder votes needed to secure a new term on the Board.  Instead of stepping down from the Board permanently, as he was required to do, he stepped down and was immediately reappointed by the Board that same day as a Trustee.  The Trustees willfully disregarded the results of the election and the will of the shareholders, an outright disenfranchisement of CWH shareholders.

38.     Tellingly, on June 21, 2013, Corvex-Related announced that holders of over 70% of CWH common stock consented to the removal of the entire Board.  Nevertheless, the Trustees refused to acknowledge the results of the consent solicitation, and the Board remained in place.

**B.      The Arbitration Is Resolved In Favor Of CWH Shareholders**

39.     In the Arbitration, Corvex-Related asserted, among others, the following claims directly and derivatively against the Trustees: (1) that the 3-year/3-% ownership requirement in the Bylaw (discussed below) was invalid and unreasonable; (2) that certain delay provisions in the Bylaw unfairly interfered with a shareholders' right to remove a trustee; (3) that the Board could not unilaterally eliminate CWH shareholders' right to remove a trustee "without cause"' and (4) that the fee-shifting bylaw was invalid and unilaterally adopted by Trustees to thwart shareholder suits.

40.     On August 7, 2013, the Panel issued an interim ruling invalidating as a matter of law the onerous ownership requirement adopted by Trustees on March 1, 2013.  *See* Interim

Order Granting in Part and Denying in Part Respondents' Motion for Partial Summary Judgment, dated August 7, 2013 [hereinafter, the "August Award"], attached hereto as Exhibit B.

41.     The Panel held that the 3-year holding period and the 3% ownership restriction on shareholders seeking a record date for a consent solicitation **substantially impaired** shareholder rights, made a consent solicitation "unreasonably difficult to achieve" and that "the requirements taken together were unreasonable as a matter of law." *See id.*

42.     On September 23, 2013, in an apparent effort to try to rehabilitate its image prior to the evidentiary hearing, the Trustees conceded that significant corporate governance reforms were needed at CWH and decided to: (1) un-stagger the Board, (2) terminate the Company's poison pill early, (3) increase the size of the Board by two "independent" trustees and (4) restructure the management agreement to align RMR's compensation with the Company's performance.[1]

43.     Thereafter, the Panel held a two-week long evidentiary hearing that commenced on October 7, 2013.  On November 18, 2013, the Panel issued its final ruling on the merits holding that various bylaw amendments made by the Trustees to the Bylaws were invalid and unreasonable.  Specifically, the Panel found that **"there is no question that CWH's Bylaws, in the aggregate, erect a complex wall of procedural hurdles to any consent solicitation."**

44.     Specifically, the Panel invalidated the bylaw that eliminated the CWH shareholders' right to remove Trustees "without cause".  The Panel held that this bylaw amendment was invalid because it was inconsistent with § 2.3 of the Decl. of Trust providing that a "Trustee may be removed at any time with or without cause…"  (Ex. C, Nov. Award, at 6.)

---

[1] In the shareholder actions, plaintiffs alleged that RMR's compensation structure was misaligned with Company return and shareholder value, and required modification as well as the reimbursement of excessive compensation paid to RMR in prior years.   Trustees have conceded that RMR's compensation structure was, in fact, misaligned with shareholder return but they have not made CWH whole for damages incurred in prior years as a result of this misalignment.

45.     The Panel also invalidated amendments to those bylaws that substantially interfered with CWH shareholders' ability to secure a record date for a consent solicitation. Specifically, the Panel struck down as unreasonable the requirement that a shareholder seeking a record date for a consent solicitation must present actual share certificates for all shares owned in order to obtain a record date, holding that such a requirement goes far beyond what is "reasonable or appropriate" and also is inconsistent with the Decl. of Trust § 2.3.  (Ex. C, Nov. Award, at 9.)   The Panel also struck as invalid those bylaws that significantly delayed the effective time of a shareholder action by written consent by up to 210 days, holding that such a delay is inconsistent with the Decl. of Trust § 2.3, which provides that shareholders may remove Trustees with or without cause *at any time*.  (Ex. C, Nov. Award, at 9.)

46.     Moreover, the Panel upheld its prior ruling that the bylaws at § 2.15(a) and 2.14.1(b)(ii), adopting the 3%/3-Year requirement in § 2.14.1(b)(ii) by reference, for any shareholder seeking a record date for a consent solicitation, was inconsistent with the Decl. of Trust § 2.3.  (Ex. C, Nov. Award; Ex. B, Aug. Award, at 1-2.)  The Panel also held that the bylaws do not appear to "adequately set forth a mechanism for the effective nomination of new Trustees [if the 3%/3-Year provision applied]"; "there would be no more than one or two shareholders, acting alone, who could satisfy the Requirement.  Such a result would not make any sense and could have various unintended and undesirable consequences."  (Ex. C, Nov. Award, at 11.)

47.     The Panel invalidated the onerous fee-shifting provision at § 15.2 of the Bylaws and § 7.12 of the Decl. of Trust, which purported to make *shareholders* personally liable to the Company for fees, costs and expenses incurred in any action against trustees in which the shareholder did not prevail.  Specifically, § 15.2 of the Bylaws provided:

each shareholder will be liable to the Trust (and any subsidiaries or affiliates thereof) for, and indemnify and hold harmless the Trust (and any subsidiaries or affiliates thereof) from and against, all costs, expenses, penalties, fines or other amounts, including, without limitation, reasonable attorneys' and other professional fees, whether third party or internal, arising from … any action by or against the Trust (or any subsidiaries or affiliates thereof) in which such shareholder is not the prevailing party, and shall pay such amounts to such indemnitee on demand,….

48.     The Panel found that this provision and certain language in the Decl. of Trust at § 7.12 were inconsistent with an earlier provision in the Decl. of Trust, § 8.3, which provides "provisions governing the personal liability of the Shareholders" and that "the prohibition of assessments upon Shareholders may not be amended in any respect that could increase the personal liability of such Shareholders." (*See* Ex. C, Nov. Award, at 12.) The Panel also created a process and timeline for Corvex-Related to conduct a new consent solicitation and in order to ensure a fair and orderly process, the Panel reopened the proceeding pending the final result of the new consent solicitation. On December 3, 2013, Corvex-Related filed with the SEC their preliminary consent solicitation for the removal of the Board of Trustees.

49.     Defendants have caused CWH to spend millions of dollars defending their gross misconduct. According to CWH's Form 10-Q for the period ending September 30, 2013 ("Q3 2013 Financials")," CWH has over $25 million dollars in general and administrative expenses, which is purportedly comprised of fees, costs and expenses associated with the Corvex-Related Arbitration. CWH has paid and continues to pay all outstanding legal costs and expenses (including those legal costs incurred by Defendants) associated with the Corvex-Related Arbitration and will continue to spend Company funds fighting the new consent solicitation when only seven months ago over CWH shareholders who own over 70% of the outstanding shares of CWH overwhelmingly approved the removal of all five Defendant Trustees. Corvex-

Related reported in a statement filed with the SEC on January 16, 2014, that Defendants have now wasted over $30 million dollars of Company funds on the Corvex-Related Arbitration.

50.     Furthermore, according to CWH's Q3 2013 Financials:

> We, along with RMR, certain of our officers and current and former Trustees, have been named as defendants in a number of complaints seeking monetary damages and declaratory and injunctive relief, including, among other things, complaints filed by or on behalf of Corvex/Related. ***In connection with such litigation, we have agreed to indemnify our present or former Trustees or officers who are made or threatened to be made parties to a legal proceeding by reason of their service in that capacity and have also agreed to indemnify RMR for certain claims brought against RMR in its capacity as our business and property manager.***

*See* CWH's Q3 2013 Financials (emphasis added).

### C.    Defendants Are Not Entitled To Indemnification

51.     The Decl. of Trust § 7.4(b) provides that:

> Each Affiliated Trustee and any Affiliates (as defined by Section 7.5 hereof) of such Affiliated Trustee shall be indemnified by the Trust against any losses, judgments, liabilities, expenses and amounts paid in settlement of any claims sustained by them in connection with any action or inaction of such Affiliated Trustee or Affiliate **if such Affiliated Trustee or Affiliate, in good faith, determined that such course of conduct was in the best interest of the Trust and if such conduct did not constitute negligence or misconduct on the part of such Affiliated Trustee or Affiliate.** Notwithstanding the foregoing, Affiliated Trustees and their Affiliates … shall not be indemnified for any losses, liabilities or expenses arising from or out of an alleged violation of federal or state securities laws unless (i) there has been a successful adjudication on the merits of each count involving alleged securities law violations as to the particular indemnitee, or (ii) such claims have been dismissed with prejudice on the merits by a court of competent jurisdiction as to the particular indemnitee or (iii) a court of competent jurisdiction approves a settlement of the claim against the particular indemnitee…. **The provision of advances from Trust funds to the Affiliated Trustees and any Affiliates for legal expenses and other costs incurred as a result**

**of any legal action initiated against the Affiliated Trustees by Shareholders of the Trust is prohibited.**  (Emphasis added.)

*See* Ex. A, Decl. of Trust at § 7.4(b).  Thus, § 7.4(b) provides that CWH could indemnify persons deemed an "Affiliated Trustee" and any "Affiliate" thereof, for legal costs and expenses, ***only if*** the "Affiliated Trustee or Affiliate, in good faith, determined that such course of conduct was in the best interest of the Trust and if such conduct did not constitute negligence or misconduct on the part of such Affiliated Trustee or Affiliate."  *See id.*  Those limited circumstances are not present here.

52.    An "Affiliated Trustee" means any trustee "who is not an Independent Trustee" and an "Independent Trustee" is defined, in relevant part, as:

> a Trustee who, in his individual capacity, (i) is neither an Affiliate of, nor has any material business or professional relationship with, the Advisor…. and (ii) does not perform any services for the Trust except as Trustee.

Ex. A, Decl. of Trust, at § 1.4 (c) and (k).  Moreover, "Affiliate" for purposes of § 7.4(b) is defined as an individual or entity that:

> (i) directly or indirectly controls, is controlled by, or is under common control with such Affiliated Trustee; …; (iii) is an officer, director, partner or trustee of such Affiliated Trustee; or (iv) is a company for which such Affiliated Trustee acts as an officer, director, partner or trustee….

Ex. A, Decl. of Trust, at § 7.5.

53.    Defendants each qualify as an Affiliated Trustee or an Affiliate of an Affiliated Trustee pursuant to the definitions in the Decl. of Trust.

54.    B. Portnoy is an Affiliated Trustee because he controls and owns (along with his son A. Portnoy) 100% of RMR.  RMR is CWH's Advisor and is entirely owned and controlled by the Portnoys.  As owner and Chief Executive Officer of RMR, B. Portnoy controls CWH and

all other RMR-managed companies. A. Portnoy qualifies as an Affiliated Trustee because he is an executive of RMR, an officer of CWH and together with his father owns 100% of RMR. As a result of their power, control and self-interests, B. Portnoy and A. Portnoy are deemed "Managing Trustees" not "Independent Trustees" in the Company's public filings. RMR is an "Affiliate" of the Affiliated Trustees A. Portnoy and B. Portnoy because it serves as CWH's Advisor and is controlled and owned 100% by the Portnoys.

55.  Popeo is an "Affiliate" of the Affiliated Trustees A. Portnoy and B. Portnoy on account of Popeo's role as CFO of RMR, CWH and all other RMR-managed companies. Moreover, as a result of his positions as executive officer of RMR and other RMR-controlled companies, he is directly or indirectly controlled by, and is a partner of, Affiliated Trustees A. Portnoy and B. Portnoy.

56.  Lamkin, Morea and Zeytoonjian are "Affiliates" because they directly or indirectly control, are controlled by, or are under common control with the Affiliated Trustees, or a partner of the Affiliated Trustees. Lamkin, Morea and Zeytoonjian are controlled by and are under common control with the Portnoys given their directorships on the boards of companies founded by the Portnoys, managed by RMR and controlled by the Portnoys. As described in detail below, *infra* ¶¶ 81-101, each Defendant has material past and present personal and professional relationships with the Portnoys. Their directorships, the compensation earned from these various positions, the friendships, and certain lucrative past business dealings, render Lamkin, Morea and Zeytoonjian under the Portnoys' control, directly or indirectly. That control is further solidified by the fact that Trustees have no directors' and officers' liability insurance to protect themselves or their personal financial interests in the various shareholder litigations stemming from their conduct. As a result, these Defendants rely on the Portnoys for their legal

defense and the defenses costs, which are being improperly advanced and paid using CWH funds.

57.     Defendants are not entitled to indemnification for any of the fees and costs incurred in connection with the Corvex-Related Arbitration, which has been adjudicated and decided in favor of CWH and its shareholders.

58.     As evidenced by the Panel's rulings, a well-developed evidentiary record and the indisputable facts (most of which are derived and verifiable from Defendants' own public filings), Defendants disregarded their fiduciary duties when they acted in bad faith, in their own self-interest, by adopting invalid and unreasonable bylaws aimed at disenfranchising CWH shareholders and entrenching themselves.

59.     Defendants also acted with deliberate dishonesty when they and their agents: (a) sought to dupe the Maryland Legislature into amending a law that would eliminate CWH shareholder rights to remove a trustee without cause; (b) amended the bylaws on March 1, 2013 to adopt the onerous 3-year/3% ownership requirements for obtaining a record date for a consent solicitation, thereby making it infeasible for shareholders to initiate a consent solicitation, (c) required shareholders to provide their original stock certificates to pursue a consent solicitation; (d) elongated the consent solicitation process to cause unreasonable delays; and (e) amended the Bylaws to eliminate the right to remove a trustee without cause without authority and in contravention of the Decl. of Trust and Maryland REIT Law.

60.     In the aggregate, Defendants' complex set of procedures were devised and implemented in bad faith and with the specific intent of eliminating certain shareholder rights in order to entrench themselves, the Portnoys, RMR and the existing management.  That their conduct was done in bad faith is demonstrated by Defendants' purposeful destruction of

Company value when they (1) completed a highly dilutive equity offering at a significant discount (costing CWH over $200 million dollars in damages); (2) sold CWH's equity interests in SIR and GOV at a discount; (3) threatened to put the entire Company in default upon a change in control; (4) reappointed Defendant Morea as a Trustee after an overwhelming majority of CWH shareholders voted *against* his re-election as a Trustee; and (5) failed to secure D&O insurance for the benefit of CWH.

61.     Defendants are not entitled to indemnification under § 7.4(b) of the Decl. of Trust as an entire evidentiary record and two Arbitration Awards support the conclusion that Defendants' conduct was not in good faith or in the best interest of the Company and amounted to "negligence" or "misconduct".

62.     Moreover, Defendants are not entitled to indemnification under § 7.4(a) of the Decl. of Trust because that provision only applies to trustees or officers who are neither an Affiliated Trustee or an Affiliate of an Affiliated Trustee. *See* Ex. A, Decl. of Trust at § 7.4(a). Since each Defendant is an Affiliated Trustee or an Affiliate of an Affiliated Trustee, § 7.4(a) of the Decl. of Trust is inapplicable.   However, even if § 7.4(a) applied, which it does not, Defendants conduct has been adjudicated "to have arisen out of or been based upon his willful malfeasance, bad faith, gross negligence or reckless disregard of duty. . . ." *See id.*  As a result, CWH is not required to indemnify Defendants under either §§ 7.4(a) or (b) of the Decl. of Trust.

63.     Given the Panel's findings in favor of CWH and its shareholders on the basis of a robust record, and the nature of Defendants' actions, Plaintiffs respectfully request an order declaring that Defendants are not entitled to indemnification by the Company in connection with the Corvex-Related Arbitration and requiring Defendants to immediately reimburse CWH for all fees and costs advanced by CWH on their behalf in the Corvex-Related Arbitration.

### D.     The Board Violates the Decl. Of Trust By Causing CWH To Advance Defendants' Legal Fees and Costs in Various Shareholder Actions

64.     Defendants' misconduct has led to the filing of numerous shareholder actions for which Defendants have received advances on their legal fees, costs and expenses from CWH.

65.     On February 28, 2013, Plaintiff DelCo initiated a derivative and class action against Defendants alleging that they abused their power and position by, among other misconduct: (1) causing CWH to engage in numerous self-dealing transactions to the detriment of CWH, (2) causing CWH to enter into a management agreements that created perverse incentives for RMR and led to increases in RMR's management fees despite the Company's poor performance, (3) adopting an unlawful arbitration clause in the bylaws and related-party transaction agreements, and (4) other mismanagement and waste.  *See Delaware County Employees Retirement Fund v. Barry M. Portnoy,* No. 1:13-cv-10405 (D. Mass.) (Hon. Denise J. Casper) (currently stayed pending a decision on the validity of the arbitration clause at issue).

66.     In addition, Defendants were sued in federal court in Massachusetts in an action by CWH shareholders asserting violations of the federal securities law, captioned *Young v. CommonWealth REIT*, No. 1:12-cv-12405-DJC (D. Mass.).

67.     Moreover, there were a number of additional direct and derivative cases filed by CWH shareholders including: (1) a derivative action filed in the Circuit Court for Montgomery County, State of Maryland, captioned *William Gore v. Portnoy*, Civil No. 373086-V; (2) a shareholder class action filed in the Circuit Court for Baltimore City, captioned *Katz v. CommonWealth REIT*, Civil No. 13001299; (3) a derivative action filed in the Circuit Court of Baltimore City, captioned *Central Laborers Pension Fund v. Portnoy, et al.,* Civil No. 24C13001966; and (4) a shareholder derivative action filed in the Massachusetts US District Court, titled *Chashin v. REIT Management & Research LLC*, Civ. No. 1:13-cv-12472-DJC.

68.     The foregoing shareholder matters, set forth in paragraphs 65 through 67 above, are collectively referred to herein as the "Shareholder Actions".

69.     Trustees granted themselves and Defendants Popeo and RMR a full and unequivocal advance on legal fees, costs and expenses in connection with the Corvex-Related Arbitration and the Shareholder Actions set forth above.

70.     However, the advancement of legal fees, costs and expenses to Affiliated Trustees and their Affiliates is ***prohibited*** by § 7.4(b) of the Decl. of Trust which unambiguously states that: "[t]he provision of advances from Trust funds to the Affiliated Trustees and any Affiliates for legal expenses and other costs incurred as a result of any legal action initiated against the Affiliated Trustees by Shareholders of the Trust is prohibited."

71.     Since the Decl. of Trust *prohibits* the advancement of fees and other costs to Defendants, Defendants breached the Decl. of Trust by approving and paying themselves advances on their legal fees and costs in connection with any and all shareholder actions brought against them.

72.     Defendants should be ordered to reimburse the Company for any and all advancements of legal fees and other costs associated with any action initiated by a CWH shareholder, including the Shareholder Actions and the Corvex-Related Arbitration.

73.     Moreover, the Board should be enjoined from causing the Company to make advancements of legal fees and costs Defendants in connection with Shareholder Actions.

**E.      Defendants Breached Their Fiduciary Duty By Failing To Protect The Company With D&O Liability Insurance**

74.     Defendants acknowledge that have been made "party to numerous legal proceedings" and that the claims brought against them "present a risk of protracted litigation, incurrence of significant attorneys' fees, costs and expenses . . . ."  (CWH's Form 10-Q, filed on

August 7, 2013).   Yet, the Company does "not have insurance to cover these potential indemnification obligations and may incur significant costs in connection with these legal proceedings or our indemnity obligations."  *See id.*

75.     Treating CWH's assets as their private piggy bank, with unfettered and unchecked access to such assets, the Trustees never secured D&O insurance for CWH.   The Trustees' refusal to procure D&O Insurance was part of a well-orchestrated and willful scheme to discourage shareholder litigation, or was at the very least negligent, resulting in a breach of their fiduciary obligations owed to CWH and its shareholders.  Defendants took a imprudent and self-interested gamble with CWH's assets, with the aim that the lack of D&O insurance would further disincentive shareholders and their counsel from pursuing litigation against the Company's Trustees.   Part in parcel of this scheme was Defendants' adoption of an onerous arbitration clause and the now-defunct fee-shifting provision at § 15.2 of CWH's Bylaws, all of which were adopted by Defendants to deter and intimidate shareholders from exercising their rights to sue in order to hold CWH's management and Trustees, as well as RMR, accountable.

76.     It was not until late 2013 that CWH secured D&O insurance.  CWH's Q3 2013 Financial state:

> Effective July 2013, we [CWH], RMR, GOV, SIR and three other companies to which RMR provides management services purchased from an unrelated third party insurer a combined directors' and officers' liability insurance policy providing $10,000[,000] of aggregate coverage.  We paid a premium of approximately $133 in connection with this policy.

77.     The Board's decision to purchase this inadequate amount of D&O insurance is too little, too late and provides CWH no relief for much of the liability that stems from Defendants' prior misconduct, as Defendants have disclosed in CWH's Q3 2013 Financials: "We do not have insurance to cover certain of these potential claims and indemnification obligations and may

incur significant costs in connection with these legal proceedings or our indemnity obligations." Thus, CWH remains unprotected with limited means of recouping funds paid defending its malfeasant Trustees, officers and managers.

78.     D&O Insurance is a customary type of insurance held by public companies and especially critical for companies like CWH who adopt limited liability provisions such as that set forth in § 7.4(c) of the Decl. of Trust.  *See* Decl. of Trust § 7.4 (stating that expect to the extent required by Maryland law, "no Trustee or officer of the Trust shall be personally liable to the Trust or its shareholder for money damages").  It was knowingly or recklessly improper for the Trustees to forego D&O Insurance as part of their plan to shield themselves liability, instead relying mistakenly on a supposed right to indemnification by CWH.  Reliance on indemnification was evidently a further effort to frustrate shareholder action, in that a successful derivative suit would not benefit shareholders if CWH were to indemnify the Trustees and officers for any damages they owed the Company.

79.     The Trustees knew or should have known that their misconduct was exposing CWH to substantial liability and protracted litigation and, yet, they decided to forgo D&O Insurance.  Trustees chose to leave CWH severely hampered in its ability to seek recompense for harm caused by its Trustees and recklessly exposed themselves and CWH to substantial liability.

80.     Having failed to protect CWH, Defendants breached their fiduciary duties of care, loyalty, and good faith to the Company and should be held personally responsible for any legal fees and costs and liability resulting from their misconduct.

## DEMAND ON CWH'S BOARD IS EXCUSED AS FUTILE

81.     Plaintiffs hereby reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

82.     From CWH's inception, RMR and the Portnoys have controlled every operational, investment, and management decision of CWH.  All of CWH's officers are officers of RMR.  CWH has no employees of its own, nor is it able to perform any of the services that it needs to operate on a day-to-day basis.  In addition, due to the control by the Portnoys of RMR and the Portnoys' use of RMR to perpetrate the wrongdoings alleged herein, RMR is an alter ego of the Portnoys. A. Portnoy and B. Portnoy are also directors, officers and/or shareholders in other RMR-managed entities, including the four publicly-traded REITs formed with assets transferred from CWH, including HPT, SNH, GOV and SIR.

83.     A litigation demand on the Board on behalf of CWH would be futile because the majority of the CWH Board is personally and directly conflicted and time and again have made decisions that benefit the Portnoys and RMR at the expense of CWH and its shareholders.  The majority of the Board cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

84.     Since the misconduct underlying the claims raised herein was validly in litigation in the prior shareholder actions, demand must be analyzed on the basis of the original five-member Board.  However, even if demand is analyzed on the basis of the expanded seven-member Board, demand is still excused because of a majority of the Board is conflicted.

**A.  B. Portnoy, A. Portnoy, Lamkin, Zeytoonjian and Morea Suffer From Direct And Disabling Conflicts of Interests Which, Alone, Is Reason Enough To Excuse Demand under Maryland Law**

85.     Defendants caused CWH to indemnify them for over $30 million spent litigating the Corvex-Related Arbitration against Defendants.  Defendants also caused CWH to provide Defendants with a substantial advance of tens of millions of dollars in attorneys' fees, costs and

expenses in connection with various shareholder actions even though the Decl. of Trust prohibits this.

86.     The five Trustees A. Portnoy, B. Portnoy, Lamkin, Morea and Zeytoonjian are directly implicated in wrongdoing that was adjudicated and decided in favor of shareholders in the Corvex-Related Arbitration.  To the extent CWH was implicated or made a party to the Arbitration, it was on account of the actions of Defendants.

87.     Moreover, Defendants' personal involvement in the wrongdoing and liability for their own legal fees and costs is concrete, not speculative, as the Panel has already found in favor of CWH shareholders in the Corvex-Related Arbitration, and invalidated the bylaw amendments adopted by Trustees.  The Panel found that the Trustees erected an unreasonable complex wall of procedures to make a shareholder consent solicitation for their removal impossible.  The Board's bylaw provisions directly offended the plain language of the Decl. of Trust.  Thus, on the basis of the rulings and a robust evidentiary record, the Trustees' conduct was in effect deemed *ultra vires*.  This is *precisely* the type of bad faith misconduct for which CWH owes Defendants no indemnification obligation.  As a result, Trustees are not owed indemnification from the Company for their unlawful conduct.  None of the original five Trustees can be expected to consider, with the objectivity required of a board member under applicable Maryland law, a demand that entails the likely dire financial impact on Trustees personally.  Since Trustees are not entitled to indemnification and their personal wealth is in jeopardy, they suffer from direct and disabling conflicts of interest.

88.     Moreover, this direct conflict of interest is amplified by Defendants' irrational decision not to secure D&O insurance, a strategy based, in part, on the misguided belief that certain bylaws, including the now invalid fee-shift bylaw, adequately extinguished the risk of

shareholders seeking to sue trustees and officers for their misconduct.  According to public filings, CWH does not "have insurance to cover certain of these potential claims and indemnification obligations and may incur significant costs in connection with these legal proceedings or our indemnity obligations."  Thus, given that they are not entitled to indemnification nor any D&O insurance to protect them, Trustees are highly exposed to significant personal liability in the tens of millions of dollars which, in and of itself, creates the type of direct personal conflict of interest that is insurmountable under Maryland's demand futility standard in *Werbowsky v. Collomb*, 362 Md. 581 (2001).

### B.  Trustees Lamkin, Morea and Zeytoonjian are Beholden to The Portnoys

89.    Demand is further excused because Morea, Lamkin, and Zeytoonjian are dominated and controlled by the Portnoys.  As described in more detail below, they each have past and current business dealings with RMR or RMR-controlled entities, and any future dealings depend on an ongoing relationship with B. Portnoy and A. Portnoy.  All three Trustees sit on one or more of the boards of AIC, HPT, SIR, SNH and/or GOV, which are RMR and Portnoy-controlled entities and were the product of self-dealing transactions.  All of these Trustees receive generous compensation in the form of salaries and stock grants through their membership on these Boards.

90.    Specifically, Lamkin has been a CWH Trustee and Chairman of the Audit Committee since 2006.  Lamkin also serves on the boards of CWH, HPT, SIR and AIC.  According to SEC filings, Lamkin owns: 10,812.5 shares of CWH common stock; 12,500 shares of HPT; and 4,000 shares of SIR.  Lamkin and A. Portnoy have much in common. Both A. Portnoy and Lamkin were investment bankers and venture capitalists at Donaldson Lufkin and Jenrette ("DLJ") and, thereafter, both joined ABN AMRO.  Lamkin sits on the Advisory Board

of Bancroft Capital, a real estate investment company that specializes in office, light industrial, and research and development properties in the Western United States through partnerships with institutional and private investors.

91.    Defendant Joseph L. Morea ("Morea") is a longtime friend and business affiliate of the Portnoys who replaced Patrick F. Donelan as a trustee of CWH on July 18, 2012.  From 2003 to the end of 2012, Morea served as Vice-Chairman, Managing Director and Head of US Equity markets for RBC Capital Markets, which engages in lucrative investment banking and other commercial dealings with CWH, RMR and RMR-related entities.  RBC Capital Markets has received millions of dollars in fees and commissions for these transactions on account of the relationship with B. Portnoy.  Incredibly, on July 17, 2012, just a day before his appointment to the CWH Board, an appointment made by the Portnoys, RBC Capital Markets was awarded joint lead manager underwriter for a public offering of $350 million of 5.625% unsecured notes for the RMR-controlled SNH.  RBC Capital Markets has received, and expects to continue receiving, fees and commissions from various stock offerings of Portnoy controlled entities. Indeed, RBC Capital Markets was an underwriter in both the SIR initial share offering, the December 2012 additional 7,000,000 share offering for SIR and had a key role in the dilutive equity offering that closed on March 5, 2013.  In 2003, RBC Capital Markets was the sole lead managing underwriter for 6,667,000 shares of a RMR Real Estate Fund created by RMR, aggregating $100 million.  In addition, affiliates of RBC are lenders under certain revolving credit facility and term loan agreements managed by RMR and receive fees and interest pursuant to the facility and agreements. RBC Capital Markets was also part of group of underwriters for an offering of nearly 11.0 million shares of CWH in July 2011, thereby earning substantial underwriting fees. RBC Capital Markets has also been selected as the joint lead manager of the

equity offering that closed on March 5, 2013.  While the Company has not reported the total amount of fees and commissions earned by Morea on account of his relationship with the Portnoy, customary fees and commissions on transactions like those involving RBC Capital Markets, run in the tens of millions of dollars.  Morea, like the other Defendants, has also been making regular financial contributions to ILC and attending ILC social events at the behest of B. Portnoy.  Morea also serves on the board of AIC along with the Portnoys, Lamkin and Zeytoonjian.  According to SEC filings, Morea owns 2,000 shares of CWH common stock.

92.     Defendant Frederick N. Zeytoonjian ("Zeytoonjian") has been a trustee of CWH since 1999, a trustee of SNH since 2003 and is a trustee of AIC.  He is the founder, Chairman and Chief Executive Officer of Turf Products, LLC, one of the largest distributors of lawn care equipment in the United States, for over 40 years.  Since joining the Boards of CWH and SNH, Zeytoonjian has earned compensation and stock grants totaling millions of dollars.  According to SEC filings, Zeytoonjian currently owns 9,642 shares of CWH and 13,500 shares of SNH.

93.     As reflected above and in the Chart below, Lamkin, Morea and Zeytoonjian have and continue to serve alongside the Portnoys on a number of interlocking boards of companies controlled by the Portnoys and RMR.

94.     Moreover, Lamkin, Morea and Zeytoonjian make regular financial contributions to, and participate in the events of, Immigrant Learning Center ("ILC"), a Massachusetts-based charity founded by B. Portnoy and his spouse, Diane Portnoy.

95.     In sum, Lamkin, Morea and Zeytoonjian have interests that are divergent to those of CWH, due to, among other things, their service as trustees of several Portnoy-related entities, their receiving compensation for such services and their connections with the ILC Portnoy-charity.  Even setting aside the direct conflicts of interest alleged herein, these considerations

alone were sufficient for the Delaware Court of Chancery to conclude that demand was futile under Delaware law in a corporate derivative suit against the Portnoys and other so-called "independent" directors. *See Kahn v. Barry M. Portnoy, et al.*, No. 3515-CC (Ch. Ct.). None of the Trustees on the original Board could serve as an independent voice, free of the potential influence of serving in a paid position of another Portnoy-related entity.

96.     Moreover, time and again, these Trustees have shown by their conduct that they cannot independently and impartially act in the best interest of CWH and its shareholders. Lamkin, Morea and Zeytoonjian approved: (a) the massively dilutive equity offering that cost CWH over $200 million in lost consideration, (b) the unprecedented and illegal bylaw amendments that were struck as invalid; and (c) caused CWH to spend over $30 million dollars seeking to defend the unlawful bylaw provisions that were *ultra vires* and contradicted both Maryland law and the Decl. of Trust.

97.     Lamkin, Morea and Zeytoonjian also agreed with, or failed to object to, the plan to hire lobbyist to dupe the Maryland Legislature into changing the law as a means of ending the consent solicitation. This last episode, in and of itself, shows that these Trustees are operating in bad faith and the lengths they would go to in defending the interests of the Portnoys.

98.     As alleged above, on March 12, 2013, when CWH shareholders urged Lamkin, Morea and Zeytoonjian to form a special committee and stop engaging in related party transactions, these Defendants ignored the request and continued allowing RMR to engage in self-dealing with the sale of certain of CWH's most valuable assets at an unfair price.

99.     Morea's allegiance to the Portnoys is so profound that despite the escalating legal and reputational problems swirling around Morea during his short tenure on the CWH Board, he

immediately accepted a reappointment to the Board on the very day that shareholders refused, by a considerable margin, to re-elect him to the Board.

100.    As a result of these conflicts and as reflected by their past misconduct, the majority of the Board has shown itself to be incapable of exercising valid business judgment. Moreover, the expansion of the Board to include two new trustees has absolutely no bearing on this ultimate conclusion because, even if these two trustees were truly independent, they are greatly outnumbered by the five other Trustees who suffer from disabling conflicts of interest.

101.    The Chart below summarizes certain allegations above.

| Trustees | CWH | RMR | SIR | GOV | SNH | HPT | AIC | The Portnoys' Charity-Immigrant Learning Center | Committed Misconduct At Issue In Arbitration | Failed To Secure D&O Liability Insurance |
|---|---|---|---|---|---|---|---|---|---|---|
| B. Portnoy | Trustee | Majority Owner Director | Trustee | Trustee | Trustee | Trustee | Trustee | Donor & Founder's Spouse | X | X |
| A. Portnoy | Trustee<br><br>President | Minority Owner<br><br>President CEO Director | Trustee | Trustee;<br><br>Former President 2009-2011 | Trustee | Trustee | Trustee | Donor | X | X |
| Zeytoonjian | Trustee | | | | Trustee | | Trustee | Donor | X | X |
| Lamkin | Trustee | | Trustee | | | Trustee | Trustee | Donor along with his spouse | X | X |
| Morea | Trustee | | | | | | Trustee | Donor | X | |

102.    For the reasons alleged above, demand is excused under Maryland law.

103.    Plaintiffs will adequately and fairly represent the interests of CWH and its shareholders in enforcing and prosecuting their rights and have retained counsel competent and experienced in stockholder derivative litigation.

104. Plaintiffs' action is not collusive for the purpose of conferring jurisdiction that the Court would otherwise lack.

## COUNT I
### Derivative Claim for Declaratory Judgment:
### Indemnification of Defendants

105. Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

106. CWH's indemnification obligation owed to Defendants is set forth in § 7.4(b) of the Decl. of Trust which expressly excludes indemnification of Affiliated Trustees and their Affiliates where the conduct at issue was not the best interest of CWH or constituted negligence or misconduct. *See* Decl. of Trust at § 7.4(b).

107. Defendants' conduct that led to the Corvex-Related Arbitration constitutes negligence or misconduct, and reflects decisions that they did not in good faith believe were in the best interests of CWH or its shareholders.

108. Moreover, as a result of their various affiliations and business interests, Defendants are each Affiliated Trustees or Affiliates and, therefore, are each bound by § 7.4(b) and are not entitled to no additional or greater rights to indemnification than those set forth in § 7.4(b) of the Decl. of Trust.

109. However, even if § 7.4(a) applied (which it does not), Defendants are still not entitled to indemnification as their conduct alleged herein and adjudicated in the Corvex-Related Arbitration arose to that of willful malfeasance, bad faith, gross negligence or reckless disregard of duty, which renders § 7.4(a) of the Decl. of Trust inapplicable.

110. The foregoing entitles CWH to the following relief, including an order declaring that:

a. Defendants are not entitled to indemnification by CWH for any losses, judgments, liabilities, expenses or amounts paid in connection with the Corvex-Related Arbitration;

b. Section 7.4 of the Decl. of Trust prohibits indemnification to Defendants by CWH in connection with the Corvex-Related Arbitration;

c. Defendants are not entitled to the advancement of legal fees, costs and expenses in connection with any Shareholder Action pending or filed against them, and the Corvex-Related Arbitration;

d. The Declaration of Trust prohibits the advancement of legal fees, costs and expenses in connection with the Shareholder Actions and Corvex-Related Arbitration; and

111.    Defendants must reimburse the Company for all legal fees, costs and expenses that the Company indemnified Defendants for in connection with the Corvex-Related Arbitration, and advanced to Defendants in connection with the Shareholder Actions and Corvex-Related Arbitration. .

112.    An actual and justiciable legal controversy exists as to whether CWH should be indemnifying and advancing to Defendants legal fees and costs incurred in connection with the Corvex-Related Arbitration, the Shareholder Actions and any shareholder action brought against them.

113.    Thus, Plaintiffs request a declaration that CWH is not required to indemnify Defendants and an order requiring Defendants to immediately repay CWH all legal fees and costs advanced to date with respect to all shareholder actions.

### COUNT II
### Derivative Claim for Breach of Fiduciary Duty
### Failure to Sufficient D&O Liability Insurance

114.    Plaintiffs hereby reallege and incorporate the allegations set forth in the preceding paragraphs as if fully set forth herein.

115.     Defendants as trustees and/or officers of CWH at all times relevant to this Count, were fiduciaries of the Company and its shareholders.  RMR owed the same fiduciary duties as manager of CWH and the alter ego of the Portnoys.

116.     As such, they owed the Company and its shareholders the highest duties of care, good faith, fair dealing and loyalty.

117.     From 1999 through at least July 2013, Defendants decided not to purchase D&O insurance and contemporaneously engaged in negligent, reckless, and/or willful misconduct that put the Company's assets at risk.  D&O insurance is a form of liability insurance customarily held by all public companies to protect companies that indemnify its directors and officers in lawsuits, among other things.

118.     Without any D&O insurance, Defendants, individually and acting as a part of a common plan, unreasonably and significantly hampered CWH's ability to seek recompense for the fees and costs it was forced to pay (improperly) for the indemnification of Defendants whose wrongful conduct constituted a waste of CWH's assets and exposed CWH to millions of dollars of liability.

119.     The Trustees' conduct was imprudent, self-interested, reckless and/or grossly negligent.

120.     The Trustees breached their fiduciary duties of good faith, fair dealing and loyalty to the Company and its shareholders by failing to secure D&O insurance.

121.     Plaintiffs have no adequate remedy at law.

### **RELIEF REQUESTED**

WHEREFORE, Plaintiffs pray that the Court enter judgment in favor of CWH on the derivative counts against Defendants, as follows:

(a)     declaring that Defendants are not entitled to indemnification in connection with the Corvex-Related Arbitration;

(b)     ordering Defendants to immediately reimburse CWH for all legal fees, costs and expenses paid by CWH on Defendants' behalf in connection with the Corvex-Related Arbitration;

(c)     ordering Defendants to reimburse CWH for any and all advances of legal fees, costs and expenses in any shareholder action and enjoining the Board, RMR or any of the Company's officers and trustees, and any other agents or representatives, from causing the Company to making any further advancements to Defendants;

(e)     declaring that Defendants breached their fiduciary duties to CWH and its shareholders by failing to secure sufficient directors' and officers' insurance;

(f)     awarding compensatory and rescissory damages;

(g)     awarding pre-judgment and post-judgment interest as allowed by law;

(h)     awarding Plaintiffs' attorneys' fees, expert fees, consultant fees, and other costs;

(i)    granting a trial by jury on all claims so triable; and

(j)    granting such other and further relief as may be just and proper.


Dated: January 24, 2014                    Respectfully submitted,


                                           /s/ Thomas G. Shapiro
                                           Thomas G. Shapiro (BBO# 454680)
                                           Edward F. Haber (BBO# 215620)
                                           Shapiro Haber & Urmy LLP
                                           53 State Street
                                           Boston, MA 02109
                                           Telephone: (617) 439-3939
                                           Facsimile: (617) 439-0134
                                           tshapiro@shulaw.com
                                           ehaber@shulaw.com
                                           *Counsel for Plaintiffs*

Chimicles & Tikellis LLP
Nicholas E. Chimicles, Esq. (PA-17928)
Kimberly Donaldson Smith, Esq. (PA- 83116)
Catherine Pratsinakis, Esq. (PA- 88062)
One Haverford Square
361 Lancaster Ave.
Haverford, PA 19041-1554
Telephone: (610)642-8500
Facsimile: (610)649-3633
*Counsel for Plaintiffs*